UNITED STATES, Appellee,

v.

Richard J. HART, Specialist Four, U.S. Army, Appellant.

No. 61,928.
CM 8702407.

U.S. Court of Military Appeals.

Feb. 26, 1990.

For Appellant: *Captain Paula C. Juba* (argued); *Colonel John T. Edwards* and *Captain Brian D. Bailey* (on brief); *Lieutenant Colonel Russell S. Estey.*

For Appellee: *Captain Randy V. Cargill* (argued); *Lieutenant Colonel Gary F. Roberson, Major Gary L. Hausken, Captain Patrick D. O'Hare* (on brief); *Colonel Alfred F. Arquilla* and *Lieutenant Colonel Daniel J. Dell'Orto.*

## Opinion of the Court

EVERETT, Chief Judge:

Contrary to his pleas, Specialist Hart was convicted by a general court-martial of one specification each of maiming, assault intentionally inflicting grievous bodily harm, and being drunk and disorderly—violations of Articles 124, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 924, 928, and 934, respectively. The court members sentenced appellant to a discharge from the Army with a bad-conduct discharge, confinement for 3 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review affirmed. 27 MJ 839 (1989).

We granted appellant's petition for review to determine whether evidence, which the Government concedes was not disclosed to his defense counsel, was material to his defense.[1] After careful review of the record in this case, we conclude that the evidence was not material and that appellant suffered no substantial prejudice from the Government's failure to disclose it.

I

This case had its genesis in a fight at the Crystal Palace, a bar in the Federal Republic of Germany. During the fight, someone bit off a piece of the ear of Private Oyler. In the course of the investigation two suspects emerged, Hart and a Private Wright. Wright originally had bragged that he had been in a fight and had bitten a man's ear off. He was in possession of part of the ear, which agents of the Criminal Investigation Command (CID) later obtained in a search of Wright's room. Later he recanted and told the CID that he had made up

the story to cover up the fact that he had spent some money belonging to other soldiers in the unit instead of buying drugs for them.

Specialist Hart became the focus of the investigation when other soldiers who had been at the scene identified him as the assailant. Hart originally told the CID investigator that he had been drunk that evening and did not know whether he had been at the bar. Later he called the investigator and told him that he had talked with a number of friends; and, since they told him that he had committed the assault, he was willing to take responsibility for it.

With these facts before them, the CID staged a photographic line up. Oyler was shown a number of photographs, including Hart's; the CID report does not indicate whether Wright's picture was included. Oyler could not identify anyone in the array as his assailant.

The Army Criminal Investigation Laboratory in Europe undertook a comparison analysis of the ear fragment, blood, and saliva samples from appellant and the victim, as well as the cigarette box where Wright had kept the ear. The analyses of the ear sample and the blood showed that they could have come from Oyler, the victim. However, analysis of the staining inside the box was inconclusive.

Trial defense counsel was not aware of these two matters.[2] During his preparation for trial, he did not make a specific discovery request because the staff judge advocate of the local command had a policy that all information developed by either the CID or the trial counsel was to be routinely provided to the defense.[3] After preferral of charges, defense counsel was given a copy of the draft CID report, which indi-

---

1. The error granted review was:

   WHETHER EXCULPATORY AND MATERIAL EVIDENCE WAS WITHHELD FROM DEFENSE COUNSEL IN VIOLATION OF *BRADY V. MARYLAND*, 373 U.S. 83 (1963).

2. The lack of disclosure first became apparent during the consideration of this case by the Court of Military Review; and the Government properly conceded that it had failed in its obli-

gation to make the evidence available to the defense.

3. Like the Court of Military Review, we commend the command for its open discovery policy. Many cases would never reach us on appeal if such routine disclosure were made by the local staff judge advocate and military investigative officials.

cated that the analyses had been ordered. He was not provided with the laboratory results, however, and did not know that they had been completed prior to the trial date. Further, he was not informed that Oyler had failed to identify appellant in the photographic line up; and he was not given certain sworn statements from Wright and two other soldiers, although he was provided with summaries of those statements.

## II

### A

In the seminal case of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court considered the effect of prosecution failure to disclose evidence and decided that the Government's withholding of material evidence violates due-process guarantees and may require setting aside the conviction or sentence. However, as the Court subsequently explained, the standard for determining "materiality" will vary with the particular factual situation.

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court distinguished between three situations. If the Government has reason to know that the witness has perjured himself and does not disclose this fact, the conviction "must be set aside if there is any reasonable likelihood that the" perjured evidence "could have affected the" outcome. 427 U.S. at 103, 96 S.Ct. at 2397. If the defense has requested specific items of evidence which are not provided, the test is whether this "evidence might have affected the outcome of the trial." *Id.* at 104, 96 S.Ct. at 398. Finally, if there is only a general request for discovery or no request at all, the court must determine whether there is "a reasonable doubt"—in view "of the entire record," including the suppressed evidence—that the accused would have been convicted had the evidence been disclosed. *Id.* at 112–13, 96 S.Ct. at 2401–02.

In *United States v. Bagley*, 473 U.S. 667, 679–80, 105 S.Ct. 3375, 3382–83, 87 L.Ed.2d

481, 493 (1985), Justice Blackmun, writing for a plurality of the Court, sought to eliminate the distinction between the second and third situations. He concluded that the applicable standard of "materiality" was the same whether there was a "specific request," a "general request," or "no request." In his view, the test was this:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

473 U.S. at 682, 105 S.Ct. at 3383. This test was purportedly based on the standard of review utilized by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct.2052, 80 L.Ed.2d 674 (1984), and *United States v. Valenzuela–Bernal*, 458 U.S. 858, 874, 102 S.Ct. 3440, 3450, 73 L.Ed.2d 1193 (1982). Justice Blackmun also observed that a prosecutor's failure to respond to a specific request might have an adverse effect on the preparation or presentation of the defendant's case, and this might be significant in applying the standard of materiality.

Justice White, joined by Chief Justice Burger and then-Justice Rehnquist, agreed with the standard of materiality that Justice Blackmun applied; but he saw "no reason to attempt to elaborate on the relevance to the inquiry of the specificity of the defense's request for disclosure, either generally or with respect to this case." *Id.* 473 U.S. at 685, 105 S.Ct. at 3385. On the other hand, Justices Marshall and Brennan would have applied a more liberal standard of materiality than did Justice Blackmun.

In *United States v. Eshalomi*, 23 MJ 12 (CMA 1986), this Court considered the applicability of the standard of materiality to military practice. There we observed that, in view of the broad discovery granted a military accused under Article 46 of the Uniform Code, 10 USC § 846, a heavier burden might rest on the United States to sustain a conviction where a specific re-

quest had been made for evidence and the Government had not complied therewith. However, it was unnecessary for us to reach that question in *Eshalomi*, because reversal was required under the reasonable-probability test.

■■ In his opinion at the court below, Judge Gilley adopted the premise that, under Article 46, discovery available to the accused in courts-martial is broader than the discovery rights granted to most civilian defendants. From this, he correctly reasoned that, where prosecutorial misconduct is present or where the Government fails to disclose information pursuant to a specific request, the evidence will be considered "material unless failure to disclose" can be demonstrated to "be harmless beyond a reasonable doubt." Where there is no request or only a general request, the failure will be "material only if there is a reasonable probability that" a different verdict would result from disclosure of the evidence. 27 MJ at 842. We agree with Judge Gilley.

### B

As we have noted, *see* note 2, *supra*, the Government has conceded that it should have disclosed the evidence to the defense team. Both parties agree that there was no intentional withholding of exculpatory evidence from the trial defense counsel. Both appellant and the United States also agree that the Court of Military Review properly considered this case as one in which only a general request for discovery was made. However, appellant argues that the opinion below erroneously concluded the evidence would not have caused a different result.

The primary issue at trial was the identity of Private Oyler's attacker. Oyler specifically identified appellant as his assailant. He admitted that he had been drinking heavily on the night in question but said that Hart "look[ed] familiar [sic] to the guy ... [he] got in the fight with." He based his identification on appellant's

"height and the way his hair was shaped." While Oyler conceded that he had not identified anyone in particular following the fight, he became certain that it was Hart "[a]fter seeing him in person." [4]

If Private Oyler had some uncertainty as to the identity of Hart, another witness, Private Pell, did not. Pell had seen Hart at least twice on the night of the fight. The first time, Oyler and Hart had been arguing, and Hart had told Pell "to get ... [Oyler] out of my face." At that time, Hart had hit Oyler, and a number of soldiers—Pell among them—had intervened to break up the fight. Pell had taken Oyler into the latrine to clean him up and to allow Hart to leave the bar. After an interval, Pell and Oyler started to leave, only to be confronted again by Hart as they left the premises; and another fight had begun. Pell specifically testified that he had heard Hart remark that he should "bite" off Oyler's ear and that Hart then did so.

Pell's in-court identification of Hart was clear and without any hesitation. He further testified that he had seen Hart in the dining facility and that he had seen his name tag on his fatigues.

Private Butterworth and Specialist Four Stevens both testified that they had known Hart before the fight at the Crystal Palace. According to Butterworth, during the fight with Oyler, Hart had made the comment that he was "going to bite" Oyler's "ear off." Stevens had "[n]o doubt at all" that appellant was the person who had bitten Oyler's ear off. He, too, had seen the fight, had heard the words regarding the ear, and had seen Hart bite off a piece of Oyler's ear. Stevens' testimony was challenged as inconsistent with earlier statements; but he clarified this matter by stating that he had been scared of Hart and his friends at the time of the earlier statement.

For the defense, Hart testified that he was not at the Crystal Palace on the night of the assault but, instead, was with Corporal Holmquist at the latter's residence. He

**4.** Significantly, while Oyler may not have known Hart prior to this incident, his description of his assailant was consistent with Hart's physical appearance.

admitted that he had contacted Agent Woodall of the CID, but he denied making any admissions regarding Oyler's injuries. Holmquist testified that appellant was at his home from about 8:30 p.m. until 10:48 p.m.[5] He could not remember the movie they purportedly had watched or on what night of the week it had been.

In addition, Specialist Four Ruvo and Corporal Cassidy testified that they both had been at the Crystal Palace on the night of June 20, 1987, the night of the crime. Both also testified that they had not seen Hart at the bar that night. However, each conceded on cross-examination that he had consumed a large amount of alcohol during the evening, and Cassidy stated that his memory was "kind of cloudy." Ruvo allowed that it might have been possible that Hart had been at the bar but that he had not seen him.[6] Cassidy made a similar concession with regard to the possibility of Hart's presence at the Crystal Palace.

In light of appellant's testimony that he had made no admissions, the Government called Agent Woodall who testified that he had interviewed appellant shortly after the incident at the Crystal Palace. Appellant had told Woodall that he had been drinking at the home of a friend and did not believe that he had been involved in the fight. Woodall related that Hart had stated that he could not remember the details of the evening and needed to ask his friends if he had been at the bar during the evening.

The following day, appellant called Woodall and stated that, after discussing the matter with his friends, he wanted to take "responsibility for what he had done." However, he declined to make a written statement.

5. Butterworth placed the time of the fight at 9:30 p.m.

6. On cross-examination, Ruvo initially stated that he had not been intoxicated and that he had not drunk "a lot." However, he subsequently admitted to having consumed a considerable quantity of alcohol.

7. The photographs were included as an attachment to a government appellate exhibit first filed with the court below.

■ In light of this evidence, we do not believe that a reasonable probability exists that the undisclosed evidence would have affected the findings in this case. It is true that the failure of Oyler to identify appellant from a photographic array might have had some impeaching value. However, Oyler's in-court identification of Hart was based on his height and the shape of his hair—factors not readily apparent in the photographs, which simply showed the heads and shoulders of the soldiers in the array.[7]

More importantly, three other soldiers who were at the scene clearly identified Hart as the assailant in this case. Pell, who was sober during the evening, had been present when appellant first argued with Oyler and struck him. Further, he had been escorting Oyler home when appellant had confronted him outside the club, and he had seen this fight as well. His testimony was corroborated in almost all aspects by Butterworth and Stevens, both of whom knew appellant by sight.

■ The forensic evidence was of minimal value.[8] The report merely confirmed that the ear fragment was probably that of Oyler. The blood would naturally have come from Oyler, since it was his ear that was contained in the box; and there was no indication that any of appellant's bodily fluids, i.e., blood or saliva, would have been present. Any contention that further testing as to the other fluids, if any, might have helped Hart's case is speculative. As Judge Gilley observed, "the laboratory report was neutral in result, and not exculpatory." 27 MJ at 842.

8. The Government correctly notes that the draft CID report which was furnished to trial defense counsel did mention the fact that the ear fragment had been forwarded to the laboratory for forensic analysis. Thus, defense counsel should have anticipated that a further report on the result would be made.

■ Omission of the written statements from the CID report could not have prejudiced appellant either. The statements at issue were from three potential defense witnesses. One of those witnesses (Ruvo) testified at trial, and the others apparently were not called because of tactical considerations. Appellant's argument as to the generalized prejudice flowing from the omission simply does not withstand scrutiny.[9]

Finally, the evidence supporting appellant's alibi was not persuasive. Neither Cassidy nor Ruvo could clearly exclude appellant's presence from the Crystal Palace at the time of the assault. While Corporal Holmquist's testimony tended to support appellant most strongly, he could not remember critical details of the evening, so the members could have concluded that he was mistaken as to the date.

### III

In light of the foregoing analysis, we are convinced that there was no reasonable likelihood that the evidence not disclosed by the Government at trial would have affected the findings of guilty in this case.

The decision of the United States Army Court of Military Review is affirmed.

Judges COX and SULLIVAN concur.

---

9. Under the facts of this case, we need not express any opinion as to the appropriate course of action had the existence of this evidence become known during trial. *But see United States v. Trimper*, 28 MJ 460, 468 (CMA), *cert. denied*, —— U.S. ——, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989).