UNITED STATES, Appellee,

v.

Rodney O. MORRIS, Lance Corporal,
U.S. Marine Corps, Appellant.

No. 98–0471.
Crim.App. No. 96–1146.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 11, 1999.

Decided Sept. 30, 1999.

GIERKE, J., delivered the opinion of the Court, in which COX, C.J., and CRAWFORD, J., joined. EFFRON, J., filed a dissenting opinion in which SULLIVAN, J., joined. SULLIVAN, J., filed a dissenting opinion.

For Appellant: *Lieutenant Commander Michael J. Wentworth,* JAGC, USN (argued); *Lieutenant Syed N. Ahmad,* JAGC, USNR and *Lieutenant Lisa C. Guffey,* JAGC, USNR.

For Appellee: *Lieutenant William C. Minick,* JAGC, USNR (argued); *Colonel Kevin M. Sandkuhler,* USMC, *Commander Eugene E. Irvin,* JAGC, USN, and *Lieutenant Kevin S. Rosenberg,* JAGC, USNR (on brief); *Commander D.H. Myers,* JAGC, USN, and *Lieutenant Russell J. Verby,* JAGC, USNR.

Judge GIERKE delivered the opinion of the Court.

A special court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of making a false official statement, in violation of Article 107, Uniform Code of Military Justice, 10 USC § 907. Appellant also was charged with indecent assault, in violation of Article 134, UCMJ, 10 USC § 934, but he was convicted only of the lesser-included offense of assault consummated by a battery, in violation of Article 128, UCMJ, 10 USC § 928. The court-martial sentenced appellant to a bad-conduct discharge and reduction to the lowest enlisted grade. The convening authority approved the sentence but suspended the bad-conduct discharge for 24 months from the date of his action. The Court of Criminal Appeals affirmed the findings and sentence. 47 MJ 695 (1997). This Court granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED BY WITHHOLDING DOCUMENTS, AFTER AN *IN CAMERA* REVIEW, FROM THE DEFENSE WHICH CONSISTED OF THE ALLEGED VICTIM'S MEDICAL AND FAMILY SERVICE CENTER RECORDS WHICH CONTAINED REFERENCES TO SYMPTOMS AND DIAGNOSES OF POST TRAUMATIC STRESS DISORDER.

For the reasons set out below, we affirm.

### Factual Background

Appellant and the victim, Lance Corporal (LCpl) CM, worked together as cooks and described themselves as "good friends." CM testified that they did not have a romantic or sexual relationship. They spent off-duty time together, "[j]ust hanging out" in each other's barracks rooms, CM's boyfriend's room, or their workplace. LCpl CM testified that, "[a]t times," they had conversations of a sexual nature. She testified that she and appellant gave each other back rubs, that appellant massaged the calves of her legs on one occasion, and that on two or three occasions appellant straddled her in bed to massage her back and shoulders. Asked if she remembered testifying previously that she and appellant sometimes fell asleep together, she responded, "I don't remember ever saying that, occasionally, we did that." She testified further that she did not remember appellant lying down next to her. LCpl CM denied having any contact of a sexual nature with appellant before the incident underlying the charges.

Contrary to CM's denial that they had any sexual contact, appellant testified their friendship "progressed into a more physical touching and things of that nature." He testified that he had fondled her breast on one occasion and touched her vagina on another occasion. He testified that CM had squeezed his buttocks while he was working at the grill in the mess hall, and fondled his genitals while they were both sitting on his bunk in the barracks. Appellant testified that the fondling in the barracks happened while appellant's roommate was present, and the roommate corroborated appellant's testimony at trial.

On May 29, 1995, the day of the alleged offense, appellant visited CM in her barracks room four times. Approximately 30 minutes into the final visit, they began to talk about their relationship. At this point, their respective versions of the events diverge.

CM testified that appellant told her that he "cared deeply" about her. She responded that she "liked him, too—as a friend; but that nothing more than that could become of it," because she had a boyfriend. Appellant responded that they could be secret lovers. CM testified that appellant then took off his shorts and was nude from the waist down. CM was wearing a robe with nothing underneath. She testified that appellant got on top of her and was fondling her. She told "him to get away from" her, and he responded by saying, "[W]e can keep this a secret; and you're going to like it; I know you want it." She testified that appellant sucked on her breasts and her neck, and grabbed one of her hands and placed it on his penis. She "squeezed one of his testicles," causing him to "let out a yell."

CM testified that the door of her barracks room was "cracked open" and that she and appellant were "fighting and screaming and yelling" the whole time, for about 20–30 minutes. She told him to get off her 4 or 5 times, but "he was trying to shut [her] up, and he sucked on [her] neck harder." Eventually LCpl CM told appellant "to get the f—— off me."

CM testified that "[a]s soon as appellant got up, he said, 'I feel so stupid. I thought you wanted it.'" She testified that appellant said, "Don't tell anybody anything, because it can be a big legal thing, and I could get in trouble; and you'll go crazy." Later, CM walked with appellant to the dining hall and barracks recreation area, and talked with several Marines before returning to her room for the night.

That night, CM's boyfriend noticed the "hickeys" on her neck. He became angry, thinking that she had been cheating on him. CM testified that she first told her boyfriend that she had been cheating on him, because she wanted to hide the incident with appellant from him. As he started asking her with whom she had been cheating, she told him that appellant had attacked her.

On the next day, after discussing the incident with another female Marine, CM reported the incident to her first sergeant and then to an agent of the Naval Criminal Investigative Service (NCIS).

Appellant's testimony regarding the incident differed significantly from CM's. He testified that CM asked him "in a sexy tone or seductive tone" how he felt about her. He told her, "I like you a lot, I think you're fine." Appellant testified that CM responded that "she didn't know that that's the way [he] felt." Then she leaned forward and put her head on his chest, turned her head and kissed him on the neck. Appellant kissed her on the neck and ear lobe and began rubbing her hip, and she responded by moaning and saying that he was making her "horny."

Appellant testified that when he attempted to kiss her on the lips, she said, "No, not on the lips." He stopped momentarily and then resumed kissing her on the neck. After more mutual kissing, appellant leaned CM back onto the bed. Her robe fell open and appellant began kissing her on the top of her breast. He testified that she responded by continuing to kiss him, moan, and say he was making her "horny."

Appellant testified that he then removed his shorts and underwear, and CM laughed or smirked and said, "Oh, my god." He placed her hand on his genitals, and she did not respond. He then lay on top of her, and they engaged in more mutual kissing and hugging. He testified that, "all of a sudden, she said, 'Stop,'" in a "[s]oft and sexy" tone of voice. He said, "What?" and kissed her. She again said, "Stop it" in a "real soft" voice. Appellant testified that he asked her, "What, are you toying with me?" She then said, in a command tone, "Stop, get the f—— off me." Appellant got off immediately. He testified that there was no screaming and yelling during the entire episode.

He testified that he was upset and confused. CM told him, "Don't tell nobody." He responded, "[W]hy would I tell anybody,

because I'm the one that's married." At her request, appellant followed CM to the mess hall.

Appellant made two pretrial statements that were received in evidence. On May 30, 1995, the day after the incident, appellant was interviewed by an NCIS agent and provided a sworn statement. Appellant's trial testimony was generally consistent with this statement.

On June 14, 1995, appellant was interviewed again and provided a second sworn statement. This statement was more incriminating than his first statement.

In this second statement, appellant said that he started kissing CM and became sexually aroused. He said that CM would not allow him to kiss her on the lips. He admitted that CM pushed him away when he began fondling her breast. He stated that he is "very aggressive" when he has sex and he "did not notice her pushing [him] away." He stated that he "just thought she was playing hard to get."

Appellant stated that he then removed his clothing and opined that CM may have been frightened by the size of his penis. He admitted forcing her to touch it. He admitted attempting to fondle her genitals but said that CM "kept pushing [his] hands away." He concluded his statement with the following:

I do recall [CM] repeatedly telling me to get off of her but I did not take her seriously. I really thought she was trying to play hard to get. At that very moment I was not listening closely to what she was telling me because all I was thinking about was having sex with her. After several minutes of [CM] telling me to get off of her, I did hear her tell me loudly and in no uncertain words, "Stop, get the f[——] off of me." I then got off of her and I put my clothes back on. I told [CM] that I felt she was toying with me.

I would like to explain that I am very aggressive when I engage in sexual course [sic]. I have on various occasions been told by different women that I am rough and aggressive when I engage in sex. I guess I just got carried away with [CM].

I was not trying to scare [CM] nor was I trying to get her to do something she did not want to do. I am very sorry about what happened.

At trial, appellant repudiated the second statement and attempted to explain it away by testifying that he did not read it carefully. He testified that he trusted the NCIS agents to accurately record his answers to their questions and that he "skimmed right through the statement" without reading it carefully.

Before the court-martial convened, appellant requested "all paperwork maintained by the Government (including files and records kept at MCAS [Marine Corps Air Station] El Toro, Camp Johnson, and Boot Camp) concerning [CM]'s previous allegations of sexual harassment/assault/rape." The military judge ordered that these records be furnished to the defense.

Appellant also requested the following records:

[A]ll psychological and medical records of the alleged victim in the subject case, to include inpatient and outpatient medical records, counseling records maintained by the Family Service Center at MCAS El Toro and all other Family Service Centers that rendered assistance to the alleged victim, and to include the personal notes of the counselors and Doctors and Psychologists who evaluated and/or provided treatment to the alleged victim.

The Government asserted that these records were irrelevant and that disclosure would be an unwarranted invasion of CM's privacy. The military judge ordered that all such documents be delivered for his *in camera* review. Except for a statement the victim had made to her counselor concerning her recollection of the appellant's attack on the date in question, the military judge determined that these records did not include any information material to his defense. The records were sealed and attached to the original record of trial as Appellate Exhibit L(50).

The theory of the defense was outlined in defense counsel's opening statement as follows:

[B]efore I tell you what evidence you are going to hear from the defense and the Government in this case, basically, referring to the assault, I want to make one thing absolutely clear. Lance Corporal Morris did kiss Lance Corporal [CM] on the neck, on the cheek, between the breasts. No dispute. He did suck on her breasts as well. No dispute. And he did pull her hand to his erect penis. This is all going to be clear. Not in dispute. The only issue in dispute, an issue that you're really going to have to focus on during this week is whether he did it against her will and without her consent, with unlawful force and violence.

*Discussion*

Appellant now asserts that the military judge erred by refusing to release medical records diagnosing LCpl CM as suffering from post-traumatic stress syndrome and counseling records describing her as having difficulty controlling her impulses. Appellant argues that this information should have been disclosed because it related to CM's credibility and her motive to fabricate the allegations.

The Government asserts that the information withheld by the military judge was irrelevant. The Government argues that, even if it was relevant, any error in refusing to disclose it was harmless in light of the overwhelming evidence of appellant's guilt.

 Article 46, UCMJ, 10 USC § 846 provides: "The trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." The President has promulgated RCM 701 and 703, Manual for Courts–Martial, United States (1998 edition),* to implement Article 46. *See* Drafters' Analysis of RCM 701 and 703, Manual, *supra* at A21–31 and A21–35.

RCM 701(a)(2)(B) entitles the defense, upon request, "to inspect ... [a]ny results or reports of physical or mental examinations ... which are within the possession, custody,

or control of military authorities, the existence of which is known or by the exercise of due diligence may become known to the trial counsel, and which are material to the preparation of the defense[.]" RCM 701(h) defines "inspect" as including photographing and copying. RCM 701(g) places responsibility for regulating discovery on the military judge. RCM 703(a) gives the prosecution and the defense "equal opportunity to obtain witnesses and evidence, including the benefit of compulsory process."

 The key question when discovery is denied is whether the information or evidence that was not disclosed was "material to the preparation of the defense." In *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481, the Supreme Court "rejected any ... distinction between impeachment evidence and exculpatory evidence." In accordance with *Bagley*, this Court has specifically held that "[i]mpeachment evidence ... can obviously be material evidence at a criminal trial." *United States v. Watson*, 31 MJ 49, 54–55 (1990). Impeachment "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 54, quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. The determination of materiality "calls for assessment of the omission in light of the evidence in 'the entire record.'" *United States v. Stone*, 40 MJ 420, 423 (CMA 1994), quoting *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In applying "the 'materiality' test, we give the benefit of any reasonable doubt to the military accused." *United States v. Green*, 37 MJ 88, 90 (CMA 1993).

 In *United States v. Eshalomi*, 23 MJ 12 (1986), this Court set out the standard for reviewing the prosecution's nondisclosure of evidence. Where the defense has submitted "a general request for exculpatory evidence or information" but no request for any "particular item" of evidence or information, failure to disclose evidence "is reversible error

---

* All Manual references are the same version as applicable at trial, unless otherwise indicated.

only 'if the omitted evidence creates a reasonable doubt that did not otherwise exist.' " *Id.* at 22, quoting *Agurs,* 427 U.S. at 112, 96 S.Ct. 2392.

■ An appellate court reviews a military judge's decision on a request for discovery for abuse of discretion. Because the determination of materiality is a question of law, we review the military judge's ruling *de novo. United States v. Charles,* 40 MJ 414, 417 (CMA 1994).

The undisclosed evidence might have added some credibility to appellant's trial testimony and his first statement to NCIS by making his description of CM's conflicting signals and sudden change of mood more believable in light of her mental condition. It might also have suggested that CM's poor impulse control and confused self-image might have caused her to falsely accuse appellant of sexually assaulting her.

We need not decide, however, whether the military judge abused his discretion, because, under the particular facts of this case, disclosure of CM's records would not have "create[d] a reasonable doubt that did not otherwise exist." *United States v. Eshalomi, supra.* Appellant provided compelling evidence of his guilt. His second statement totally undermined the defense theory that CM consented to his sexual advances. In his second pretrial statement, he repudiated the description of the incident to which he testified at trial. He was forced to attempt to explain his conflicting sworn statements. In his second statement, he admitted that he did "force her to touch" his genitals. He admitted that CM pushed him away when he began fondling her. He attempted to explain his conduct by saying that he is "very aggressive" in his sexual activities. He admitted that CM repeatedly told him to get off her, but he "did not take her seriously," because he "thought she was trying to play hard to get." He admitted that he was "not listening closely to what she was telling [him] because all [he] was thinking about was having sex with her." He concluded his statement by apologizing and explaining that he "just got carried away."

On the basis of the entire record, we have no "reasonable doubt [about] the validity of the proceedings." *Watson, supra* at 55. We are satisfied beyond a reasonable doubt that disclosure of CM's medical and counseling records would not have produced a different outcome. *See United States v. Briggs,* 48 MJ 143, 144 (1998) (no abuse of discretion in denying discovery motion where appellant confessed).

### Decision

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

EFFRON, Judge, in which SULLIVAN, Judge, joins (dissenting):

I agree with the majority that "[t]he undisclosed evidence might have added some credibility to appellant's trial testimony and his first statement to NCIS by making his description of CM's conflicting signals and sudden change of mood more believable in light of her mental condition." I also agree with the majority's view that the undisclosed evidence "might also have suggested that CM's poor impulse control and confused self-image might have caused her to falsely accuse appellant of sexually assaulting her." 52 MJ at 198.

In light of these observations, I disagree with the majority's conclusion that any error was harmless.

### I

Prior to trial, defense counsel learned that CM may have made a prior accusation of sexual assault not involving appellant. The Government provided paperwork related to that allegation of sexual assault, as directed by the military judge. The defense requested a full range of medical and psychological records pertaining to CM's reaction to that alleged sexual assault. The Government objected, and the military judge ordered all medical and psychological records on CM produced for an *in camera* inspection. Thereafter, the military judge ruled that only one of the 25 pages he had reviewed was relevant to the defense, but he failed to articulate any standard for his determination

as to which material should be released. The judge ordered all nonreleased records sealed.

The sealed records indicate that CM had reported being raped by another person only 6 months before the incident at issue in the present case. The records also indicate that she was diagnosed at the Naval Hospital Camp LeJeune as suffering from post-traumatic stress disorder (PTSD) as a result of the earlier rape. Additionally, the records include counseling documents containing a notation that CM had "trouble controlling her impulses." Appellate exhibit L.

## II

" 'Military law provides a much more direct and generally broader means of discovery by an accused than is normally available to him in civilian courts.' " *United States v. Reece,* 25 MJ 93, 94 (CMA 1987), *quoting United States v. Mougenel,* 6 MJ 589, 591 (AFCMR 1978), *pet. denied,* 6 MJ 194 (1979). When there is a defense discovery request under RCM 701(a)(2), Manual for Courts-Martial, United States (1998), the Government is required to "permit the defense to inspect: (A) Any ... papers ... which are within the possession, custody, or control of military authorities and which are *material to the preparation of the defense....*" (Emphasis added). *See also Reece, supra* at 95 ("The only restrictions placed upon the liberal discovery of documentary evidence by the accused are that the evidence must be 'relevant and necessary' to the subject matter of the inquiry, and the request must be reasonable."). In the present case, I would hold that the military judge erred by declining to release information material to the preparation of the defense.

According to the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* 424 (4th ed.1994), PTSD may include intense distress or physiological reactions when the sufferer is exposed to a triggering event that is akin to, or that symbolizes some aspect of, the traumatic event at the foundation of the disorder. The symptom of "persistent reexperiencing of the traumatic event" can result from prior sexual assault, among other possible causes of stress. "The disorder may be especially severe or long lasting when the stressor is of human design (e.g., torture, rape)." As the majority acknowledges, the information about CM's PTSD "might have added some credibility to appellant's trial testimony and his first statement to NCIS...." Appellant's version of the events in CM's apartment reflects her abrupt, unexplained, and seemingly unexplainable mood change—from sensual and consensual to a sharp demand to stop. Without the PTSD evidence, the members were left to wonder why a supposedly close and intimate friend would suddenly reverse moods in the midst of purportedly consensual sexual activity. With that information—and with expert testimony explaining PTSD and applying it to the events in this case—the members would have had the opportunity to consider a plausible explanation, which they could choose to accept or reject, for CM's conduct.

Similarly, the psychological evidence that CM had "trouble controlling her impulses" would have provided the court members with an opportunity to consider a plausible explanation in support of the evidence that CM, while dating another man, permitted herself to be in a compromising position with appellant. The morning after the incident with appellant, CM's boyfriend inquired about marks on her neck, and she initially responded that she had been cheating on him, at which point he became enraged. This information would have set the stage for the members to consider whether CM fabricated the allegations of sexual assault to assuage the anger of her boyfriend.

The undisclosed evidence in issue here "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *See Strickler v. Greene,* —— U.S. ——, 119 S.Ct. 1936, 1952, —— L.Ed.2d —— (1999), quoting *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The undisclosed evidence could have been used to raise the possibility that, with respect to CM, the combination of PTSD and CM's "trouble controlling her impulses" placed her in a compromising position with appellant and could have

caused her sudden shift of attitude. Under these circumstances, I conclude that there is "a reasonable probability" that the members would have been inclined to accept the defense theory that this was a consensual situation in which the alleged victim fabricated the allegations of assault. *See* —— U.S. at ——, 119 S.Ct. at 1953, citing *Kyles, supra* at 434, 115 S.Ct. 1555.

### III

Because the sealed records contained information that was "material to the preparation of the defense," the military judge abused his discretion to appellant's prejudice when he precluded defense access to it. *See* Art. 46, Uniform Code of Military Justice, 10 USC § 846; RCM 701(a)(2)(A) and 703(a). I would set aside the findings and sentence and authorize a rehearing.

SULLIVAN, Judge (dissenting):

I agree with Judge Effron's view of this case and join his separate opinion. In addition, I must note my further disagreement with the majority's approach to this case.

The core issue is whether relevant medical records of the rape victim should have been furnished to the defense. In my view, the majority's repetition of the detailed descriptions of the sex acts from the record is unnecessary and distracts the Court from deciding the issue before it. *See United States v. Hensler*, 44 MJ 184, 189 (1996) (Sullivan, J., dissenting in part and concurring in the result).