*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
TANG, LAWRENCE, and J. STEPHENS,
Appellate Military Judges

———————————————

**UNITED STATES**
Appellee

**v.**

**Dexter K. KUNISHIGE**
Sergeant (E-5), U.S. Marine Corps
Appellant

**No. 201800110**

Argued: 20 September 2019[1]—Decided: 17 October 2019.

Appeal from the United States Navy-Marine Corps Trial Judiciary Military Judges: Colonel Matthew J. Kent, USMC (arraignment, trial, and post-trial Article 39(a) session); Lieutenant Colonel Mark Sameit, USMC (motions); Lieutenant Colonel Brian E. Kasprzyk, USMC (motions). Sentence adjudged 27 September 2017 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, forfeiture of all pay and allowances, confinement for 39 years, and a dishonorable discharge.

———————————————

[1] The Court heard oral argument in this case at the United States Naval Academy, Annapolis, Maryland, as part of the court's Project Outreach.

***Typographical corrections made to pages 20 and 24
as of 18 October 2019.***

For Appellant: Lieutenant Daniel E. Rosinski, JAGC, USN (argued).

For Appellee: Captain Brian L. Farrell, USMC (argued); Lieutenant George R. Lewis, JAGC, USN (on brief); Major Kelli A. O'Neil, USMC (on brief).

Senior Judge TANG delivered the opinion of the Court, in which Judges LAWRENCE and J. STEPHENS joined. Judge J. STEPHENS filed a separate concurring opinion.

———————————————

**PUBLISHED OPINION OF THE COURT**

———————————————

TANG, Senior Judge:

Appellant was convicted of 13 total specifications alleging conspiracy; violation of a lawful order; rape; sexual assault; sexual assault of a child; sexual abuse of a child; aggravated assault; assault and battery; receiving, possessing, viewing, and soliciting child pornography; obstructing justice; and adultery in violation of Articles 81, 92, 120, 120b, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 892, 920, 920b, 928, and 934. He was charged but acquitted of an additional nine specifications, two of which were the result of the military judge's action under RULE FOR COURTS-MARTIAL (R.C.M.) 917, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed).[2]

The specifications arise from Appellant's interactions with three separate victims. The underlying facts are not pertinent to the resolution of Appellant's case.

Appellant raises 10 assignments of error (AOEs). He challenges various evidentiary rulings, the military judge's instructions, and the legal and factual sufficiency of the evidence. He avers he received a disparate sentence. Two AOEs relate to the manner by which the convening authority (CA) selected the members, alleging that the CA's staff judge advocate (SJA) should have revealed certain irregularities in the member selection process

———————————————

[2] Pursuant to R.C.M. 917, the military judge dismissed the sole specification of the Additional Charge and Specification 1 of Additional Charge IV.

during voir dire and that the CA violated Article 25, UCMJ, 10 U.S.C. § 825 (1986) by summarily reappointing the same improperly constituted members panel the military judge dismissed. Related to the alleged Article 25 infirmities, Appellant also asserts the Government violated his right to discovery relating to the selection of the members panel. We find this AOE has merit, reverse the findings and sentence, and authorize a rehearing.

## I. BACKGROUND

In this case, the CA intended to—and did—use grade as a proxy to nominate only senior members for Sergeant Kunishige's court-martial panel. The civilian defense counsel timely and specifically requested discovery of all communications with the potential members, and the military judge ordered the Government to produce them. The Government did not comply, repeatedly failing to disclose crucial information concerning this tainted selection process, even after the trial was completed and Appellant had been sentenced.

The withheld emails revealed that the panel president, Colonel U, was nominated solely because he was a colonel, and he was informed this was the reason he was chosen. The emails also revealed that Colonel U solicited and forwarded member nominees from within his Battalion, two of whom sat on Appellant's panel.

The Government's discovery failure, and the military judge's failure to administer proper accountability measures, precluded effective voir dire of Colonel U about the members selection process—including his knowledge of why he was selected and his role in nominating other members. Had the Defense been able to effectively voir dire Colonel U on these matters, the Defense could have challenged Colonel U for cause under the implied bias standard. The military judge would have been obliged to apply the liberal grant mandate. However, because the Government provided piecemeal and belated discovery *after findings*,[3] the Defense had no recourse other than to move for a mistrial—an "unusual and disfavored," "last resort" remedy with a much higher burden—which the military judge denied. *United States v. Diaz,* 59 M.J. 79, 90 (C.A.A.F. 2003).

We find that had the Government fulfilled its discovery obligations in a timely manner, Colonel U would have been subject to excusal due to implied

---

[3] The military judge denied a defense request to abate the proceedings until the requested discovery was provided.

bias. Because the Defense was foreclosed from making this challenge at the appropriate time, we are persuaded that in the eyes of the public, Sergeant Kunishige received something less than a court of fair, impartial members.

Our determination turns on the details of the members selection process, particularly as it relates to Colonel U, and the discovery timeline relating to that process. We detail the facts pertinent to these issues in turn.

## A. Members Selection Process Focused on Senior Members and Hand-Selected Colonel U as the Panel's "Colonel"

Appellant's case was referred to the general court-martial convened by Commanding General, First Marine Division, as established in General Court-Martial Convening Order (GCMCO) 2-15. The process of selecting members for Appellant's court-martial took place in two phases. First, Appellant's court-martial was docketed for July 2017 aboard Marine Corps Air Ground Combat Center Twentynine Palms, California. While the members selection process was in progress but not yet complete, the military judge continued the trial until September 2017 and changed the venue to Marine Corps Base Camp Pendleton, California. Then the process resumed, with the new date and location in mind.

### 1. Aborted attempt to solicit members for July court-martial

In June 2017, the SJA began the process of identifying potential members who were available to serve on Appellant's court-martial in July 2017. The G-1 Operations Officer, Captain G, took the lead in soliciting potential members.

Colonel U, the eventual panel president, was notified that he was a candidate to serve on Appellant's July 2017 court-martial. Colonel U was a recipient of the following email exchange between Captain G and the Division Chief of Staff.

Captain G, apparently tasked with providing two colonel nominees, wrote:

> Both [Colonel W] and [Colonel S] will be in Quantico during the dates for the GCM. [Colonel U] has one conflict on 10 July (Company Change of Command), however did state he is willing to support if needed. I would greatly appreciate your guidance and direction for a second Colonel.[4]

---

[4] AE CXV at 45.

The Chief of Staff responded, "U[ ] it is . . . I do not have any other Colonels in the Div at that time!"[5] Colonel U received this email, and he completed and submitted a member questionnaire. Colonel U responded, "Task acknowledged. I'll move [Major D] from [operations officer] to [executive officer] asap and she'll have Acting authority while I'm away."[6]

Before the convening authority finalized the members panel for the planned July trial, the military judge continued the trial until September 2017 and ordered the venue change. On 27 June 2017, Captain G notified leaders in the Division, including Colonel U, of the change. She asked that any previously completed questionnaires be retained and promised to coordinate members selection as the September trial date approached. Members' selection efforts ceased until August 2017.

On 3 August 2017, the commanding general signed GCMCO 1-17, which appointed five officer members. Appellant's charges were never referred to this convening order.[7] Nevertheless, in August 2017, the commanding general modified GCMCO 1-17 instead of GCMCO 2-15, the court-martial to which Appellant's case had been referred, in order to appoint members to Appellant's court-martial. The Defense did not object.

*2. Staff judge advocate's coordination with commanding general and G-1 operations officer to solicit nominees for GCMCO 1a-17*

To select members for Appellant's September court-martial, the SJA consulted the commanding general for guidance. He told the SJA that he did not want any enlisted Marines below the grade of gunnery sergeant or any officers below the grade of captain to serve on the panel. With this impermissible guidance in mind, and without providing contrary advice on the impropriety of excluding members by grade who were otherwise senior in rank and grade to Appellant, the SJA again coordinated with Captain G to solicit specific nominees who met the commanding general's established grade criteria and who were available for the dates of Appellant's court-

---

[5] *Id.* at 44.

[6] *Id.*

[7] The trial counsel represented GCMCO 1-17 as *modifying* GCMCO 2-15. Record at 180. And upon assembly of members, the trial counsel announced, "This court is convened by . . . General Court-Martial Convening Order No. 2-15 dated 30 September 2015, as amended by General Court-Martial Convening Order No. 1-17 . . . ." *Id.* at 223. GCMCO 1-17 does not refer to GCMCO 2-15 nor is there any evidence in the record that GCMCO 1-17 explicitly modified or amended it.

martial. The SJA told Captain G how many potential members to solicit, and from which required grades.

Based on the SJA's direction, Captain G prepared a message, described as an "AMHS message,"[8] which is used to communicate administrative matters within the Division. She sent the message to leaders of subordinate commands, directing six elements within the Division to nominate a total of 30 potential members, specifically delineated by grade. For instance, Colonel U's Headquarters Battalion was directed to provide two lieutenant colonels, one major, two captains, one sergeant major, and one gunnery sergeant.

*3. Colonel U forwards potential panel members from Headquarters Battalion and is then chosen as the panel's "Colonel"*

a. Colonel U's role in nominating members

As the commanding officer of Headquarters Battalion, Colonel U had either administrative or operational oversight of over 1,200 Marines. All members of the Division staff, including Marines assigned to the "G-shops,"[9] are assigned to Headquarters Battalion. Colonel U exercised administrative oversight over all Marines in the Battalion. However, he did not exercise operational control over any of the Marines on the Division staff.

When Captain G sent the AMHS message soliciting potential members for the September trial date, the Headquarters Battalion executive officer and adjutant were unavailable. Colonel U took on the task of soliciting members himself.[10]

He determined the Battalion staff would fill one captain billet as well as the senior enlisted billets. He directly solicited a captain volunteer, emailing three captains, asking them, "Need one of you (or a [captain] within your organic company, not Division Staff) as a volunteer for the subj[ect] task please."[11] As a result, one of the email recipients volunteered and Colonel U thanked him. The Battalion sergeant major identified nominees to fill the senior enlisted billets.

---

[8] The Automated Message Handling System (AMHS) is used by the Marine Corps for organizational messaging.

[9] The "G-shops" pertinent to this opinion are the G-1, G-3, and G-4, which represent the personnel, operations, and logistics elements of the General's Division staff.

[10] *See* AE CXV at 38-40.

[11] *Id.* at 31.

Colonel U determined that, based on the grade of the personnel requested, the remainder of the Battalion's support would come from Division staff—over whom he did not exercise operational control. Colonel U asked the G-shops to fill the second captain position, and to provide one major and two lieutenant colonels. Although the individual officers' supervisors provided nominees, Colonel U personally decided which of multiple nominees—for at least one position—to forward to Captain G for potential inclusion on the panel.

In order to solicit potential members, Colonel U sent an email to several officers, soliciting volunteers to fill the four remaining billets.[12] He wrote, "You know your [operational tempo] and officer availability best. I would like to first ask for volunteers from your sections before resorting to specified tasks."[13] He asked the individual G-shop leaders to "[p]lease nominate as [they] can support."[14] He did not allocate the tasks by grade.

In response to Colonel U's email, a lieutenant colonel, the Division's Inspector General (IG), replied and noted that he had usually volunteered to serve on courts-martial in the past but that he might not be an appropriate member while serving as the IG. Colonel U promised to consult the Division's SJA and did so. The SJA replied to Colonel U and the IG and noted that it "could be a potential conflict of interest."[15] Colonel U replied, "Judge, good advice, thank you," and also thanked the IG for his consideration.[16]

Additionally, Colonel U communicated with the Division SJA to confirm the rigidity of the imposed grade requirements. He then emailed, "Confirmed with the SJA that you can, if desired, go one [grade] up (but not one down)."[17]

The G-4 nominated Major R, who eventually served on the panel alongside Colonel U. Colonel U forwarded Major R's name to the G-1. After Major R was nominated, leaders within G-6 attempted to nominate a different major—Major B. However, Colonel U rejected that nominee, writing "Many thanks for the support but G-4 already volunteered for the Major's seat.

---

[12] *Id.* at 21.

[13] *Id.*

[14] Record at 1071.

[15] AE CXV at 24.

[16] *Id.*

[17] *Id.* at 3.

Could you possibly support with a [lieutenant colonel] . . .[?]"[18] This solidified Major R's position in the pool of nominees to the panel. Although Colonel U had already forwarded Major R's name to the G-1, the court member questionnaires had not yet been collated, and there were still many members to be identified.[19] However, Colonel U prioritized Major R over Major B.

As the deadline approached to provide nominees to the G-1, he reiterated his request to the various Division staff G-shops, writing, "G-1/G-2/G-3, We are still in need of two [lieutenant colonels] and a [captain] (shy of G-6 being able to fill one of them). Please let me know by COB today."[20] Then the G-2 organization nominated Captain V to Colonel U.[21]

Later, Colonel U tasked the "last [lieutenant colonel]" to G-3, writing, "[Colonel J] will provide a name today."[22] When the G-3 had still not provided a name by 17 August 2017, Colonel U sent Colonel J an email reiterating the deadline and asking whether G-3 could fill the requirement. Colonel J nominated the member who eventually sat on the panel—Lieutenant Colonel S. In response, Lieutenant Colonel S emailed Colonel U and indicated he had submitted his questionnaire.[23]

In total, Colonel U submitted seven names, two of whom served on the panel with him.

### b. Selection of Colonel U as a member

Because Colonel U was the only "Colonel[] in the Div[ision]," he was set to be nominated as a potential member had Appellant's trial taken place in July. Colonel U retained his member's questionnaire as directed.

After the July court-martial was postponed, Colonel U did not know whether he would be appointed to the court-martial panel for the later dates. Once the new September court-martial dates were identified, Colonel U received and filled the requirements under the AMHS message, forwarding

---

[18] *Id.* at 20.

[19] Colonel U sent a preliminary email at 0830 on 15 August 2017 with the names of two of the four officers owed by Headquarters Battalion. *Id.* at 27. The G-6 nominated an additional major around 1630 that same day. *Id.* at 20.

[20] *Id.* at 10.

[21] *Id.* at 13.

[22] *Id.* at 9.

[23] *See id.* at 3.

seven nominees to the G-1 to be provided to the SJA. After he provided the potential members requested in the AMHS message, he was again identified as the colonel member of the panel.

Colonel U learned that he would be submitted for the September panel when he received an email forwarded from a captain in the SJA's office relating to the selection of colonels for the court-martial. The email read in part, "G-1 sent out an AMHS pulling members from commands. [Colonel U] was not on it as the direction was to contact the Cols separately/directly."[24] The record does not indicate who selected Colonel U for the September court-martial, or why. Colonel U responded directly to the SJA's office, attaching the questionnaire he had already submitted in June.

### 4. Commanding General signs Amending Order 1a-17

The six battalions returned a total of 29 members' questionnaires, excluding enlisted members below the grade of gunnery sergeant, all chief warrant and warrant officers, and all officers below captain. The SJA prepared an amending order that appointed 15 specific members, including Colonel U and at least two other officers he nominated—Lieutenant Colonel S and Major R. In addition, the SJA provided or made available all 29 potential members' questionnaires as well as an "alpha roster." The alpha roster did not list the Article 25 criteria but merely listed name, billet, primary military occupational specialty, unit, beginning date of tour, and end of active service. The SJA recited the Article 25 criteria in an additional memorandum. The commanding general signed the draft order as presented and appointed the 15 members the SJA included on the draft order.

Although the appellant's charges were referred to GCMCO 2-15, the CA issued GCMCO 1a-17, deleting the five members from GCMCO 1-17 and appointing the 15 members the SJA recommended. This amending order modified GCMCO 1-17 "only for the case of U.S. V. SERGEANT DEXTER K. KUNISHIGE, USMC."[25]

As we will further discuss below, on the first day of trial, the military judge dismissed this panel and ordered the CA to appoint a new, properly-selected members panel. That same day, the commanding general signed GCMCO 1b-17, again amending GCMCO 1-17 only for Appellant's case. This order reappointed the same exact 15 members listed in GCMCO 1a-17.

---

[24] AE XXXII at 6.

[25] General Court-Martial Convening Order 1a-17 of 25 Aug 17.

Following *United States v. Bartee*,[26] the military judge rejected all further Article 25 challenges to the panel.

## B. The Government Failed to Provide Discovery That Would Have Revealed Colonel U's Role

The United States contends that Appellant waived his right to relief for any discovery violation that may have occurred. A detailed analysis of the record of trial is required to decide this issue. We resolve this issue in Appellant's favor.

### 1. Discovery requested, ordered, and provided during trial

At arraignment, the military judge directed the Government to provide the defense counsel any court-martial amending order and the members' questionnaires no later than 6 September 2017.[27] After the civilian defense counsel received the members' questionnaires on 12 September 2017, he noticed the convening order apparently excluded "staff sergeants, chief warrant officers, warrant officers, second lieutenants, and first lieutenants."[28]

On 13 September 2017, he sent an email to trial counsel, requesting discovery in the form of all communications relating to the solicitation of members, but received no response from the Government.[29] The next day, he followed his request with a telephone conversation with trial counsel during which the trial counsel incorrectly asserted that the CA did not use a solicitation email to request potential members for Appellant's court-martial. The trial counsel promised to disclose the routing sheet that accompanied the draft convening order.

Three days after the conversation with trial counsel, the civilian counsel had still not received the routing sheet or any further discovery. He filed a motion to compel discovery and to dismiss the case because he alleged the CA committed unlawful command influence by "stack[ing]" the panel with senior members. In his motion, he noted he sought, among other items: "all communication pertaining to this court-martial to any member or potential mem-

---

[26] 76 M.J. 141 (C.A.A.F. 2017).

[27] Record at 174.

[28] *Id.* at 182.

[29] *Id.* at 198.

ber."[30] The Government responded by providing the routing sheet used to submit GCMCO 1a-17 to the CA and the alpha roster that was available for the CA's review but no additional responsive materials.[31]

On 18 September 2017, the day the trial was set to begin, the court heard argument on the Defense motion.[32] The civilian defense counsel challenged the panel established in GCMCO 1a-17 as not being properly constituted under Article 25. Among other arguments, the Defense argued the order impermissibly excluded members based on grade. The SJA testified and described the process he used to solicit potential members, including the AMHS message. The SJA indicated that members were, in fact, excluded on the basis of grade at the commanding general's direction.

Finding that the CA impermissibly used grade as proxy for the Article 25 factors, the military judge dismissed the panel appointed in GCMCO 1a-17. Then the parties discussed whether the civilian defense counsel's discovery request and motion to compel discovery remained viable after the military judge invalidated GCMCO 1a-17.

At that point, the civilian defense counsel reiterated that he still requested:

> [T]o compel the production of solicitations for members for the original panel and modified panel, including, but not limited to emails, memos, *any communications with the members*. We still would like the Court to compel the production of [those] because here at court we were told there [weren't] any, and now we know that there are solicitation memos that are out there.[33]

In response, the military judge asked whether he sought just the AMHS message—which had not been provided—or any additional emails. The civilian defense counsel responded that he wanted the AMHS message and

---

[30] Appellate Exhibit (AE) XXVI. Counsel attached two memoranda from the SJA to the CA—one nominating 15 members for the convening order and another that recited the Article 25, UCMJ factors—and the members' questionnaires that were provided to the CA.

[31] *See* Appellate Exhibit XXVII.

[32] Record at 181.

[33] *Id.* at 204 (emphasis added).

"emails going back and forth between G-1, when they submitted the nominees."[34]

The military judge noted that the CA could pick an entirely new panel, rendering discovery relating to the prior panel unnecessary. The civilian defense counsel replied that if the CA were to assemble an entirely new panel, he would request the "solicitation that goes out" in support of the new panel.[35] But if the CA—according to past practice—merely ordered the same panel, the civilian defense counsel indicated that he "would like the solicitation memo that went out originally."[36]

The military judge held the issue was not yet ripe, as the CA could conceivably appoint an entirely different panel. The military judge adjourned court until a new convening order could be completed. He admonished the Government, "Government, I encourage you to be diligent in your discovery obligations, as they are persistent."[37]

The very same day, on 18 September 2017, the CA signed GCMCO 1b-17, which reappointed the exact same members as GCMCO 1a-17. The SJA emailed the amending order that evening.

The court reconvened the next day. The trial counsel defended the new convening order, relying on *Bartee* and a memo signed by the CA stating that he was "convinced these members possess the requisite age, education, training, experience, length of service, and judicial temperament to serve on this court-martial."[38] She indicated the CA considered some additional questionnaires when he determined to reappoint the same members.[39] She also argued, "So the [Government] believes we have met our burden of providing an updated convening order as well as all the requested discovery by [Defense] . . . ."[40]

Civilian defense counsel disagreed that the Government had fulfilled its discovery obligations. He said, "We have received the [AMHS] message that

---

[34] *Id.* at 205.

[35] *Id.*

[36] *Id.* at 205.

[37] *Id.* at 205.

[38] AE XXIX.

[39] Record at 206. The CA was provided four additional questionnaires.

[40] *Id.*

went out. We haven't received any of the messages that came back."[41] He specifically noted he sought "information coming back from the subordinate commands," meaning "the e-mails and content of those e-mails and communications that went to the proposed members" and "communication that went from that subordinate command to that member to fill . . . out" the members' questionnaire.[42] He specifically noted that he requested "the actual solicitation information that went back and forth to these commands" in response to the original tasking message.[43]

The civilian defense counsel continued to challenge the members panel on Article 25 grounds. He argued that the CA still categorically excluded members of specific grades, repeating the same error that afflicted GCMCO 1a-17, because the email sent to solicit the four additional questionnaires also excluded lower ranking members. However, citing *Bartee,* the military judge denied the challenge and allowed the panel established by GCMCO 1b-17—which was identical to the panel established in GCMCO 1a-17—to hear Appellant's case.

Addressing the discovery request, the military judge asked the trial counsel, "Are there items of discovery that are responsive to the defense request that have not been produced?" to which the trial counsel responded, "No, sir. We provided everything that we could think to gather that he has requested."[44] Having provided the email that was used to solicit new members on 17 September 2017, she replied, "So there isn't anything else, I think. From what I understand, defense is saying, now, that they want e-mails that were sent from the regimental commanders. I'm not even sure where that is coming from."[45]

In order to clarify the prior request, the defense counsel said,

> And we know that a solicitation went out now for sure, and why is it so difficult to go to the G-1 and say, "Send me every e-mail that came back; go out to the same people that you sent

---

[41] *Id.* at 207.

[42] *Id.*

[43] *Id.* at 208.

[44] *Id.* at 216.

[45] *Id.*

the e-mail soliciting members for; ask them for the e-mails that they sent out and give them to me."[46]

When the military judge asked for a list of requested items, defense counsel answered,

> Sir, I'm asking for all solicitations for members for the original panel and modified panels to include, but not limited to, e-mails; memos; I already have the alpha roster, but if a new one went to the convening authority, I wanted [sic] that; please provide any other memo that accompanied the selection package; please provide any route sheet that accompanied the package; please provide *any communication with the members* to include, but not limited to, e-mails or memos.[47]

In response, the trial counsel stated she relayed the request to the SJA's office and "everything that we received, we've turned over to defense counsel."[48] The military judge admonished:

> When you are standing up [sic] this courtroom in that seat, you are speaking on behalf of the big G government. So I don't want to hear about miscommunications or misunderstandings between the trial shop and the [SJA's] office. What you are doing right now is explaining whether or not the government of the United States has complied with its discovery obligations in the case of *United States v. Kunishige.*[49]

The military judge directed the trial counsel, "[E]ither tell me that you have complied with the entirety of the discovery request from the defense, or, if you have not, how you have failed, and how long it will take you to comply."[50]

Then the court recessed. When the court reconvened, the military judge stated the trial counsel informed him she had "coordinated with the staff judge advocate's office . . . and informed the Court that the . . . coordination e-mails between subordinate units and Division that gave rise to the . . .

---

[46] *Id.* at 217.

[47] *Id.* at 217 (emphasis added).

[48] *Id.*

[49] *Id.* at 218.

[50] *Id.*

nominations are being assembled into a single PDF and will be sent over shortly."[51]

The military judge then issued his ruling rejecting the Defense challenge to the panel in GCMCO 1b-17. He concluded by stating, "Trial counsel, the discovery obligations remain. Produce those as soon as they are available and attach them as appellate exhibits to . . . the record."[52] Then the military judge closed the issue and proceeded with trial, stating he believed the defense's "record [was] made," but he would provide additional opportunity to add comments to the record.[53] He then moved on to other issues and eventually proceeded to impanel the members and conduct voir dire. By that point, the Defense had received communications included in AE XXIX, but had not yet received any emails exchanged among Division leaders to identify the potential court-martial members who would be asked to provide members' questionnaires.

At about noon on 19 September 2017, during voir dire, the civilian defense counsel received a few more responsive emails, but not all of the communications that were subject to the military judge's order.[54] This batch of emails was appended to the record as AE XXXII, which primarily consisted of emails between the G-1 staff and subordinate units seeking questionnaires from the members whose names had already been forwarded to the G-1 staff as potential members. Specifically, the staff compared the list of nominees to questionnaires received and emailed to solicit the remaining questionnaires. The civilian defense counsel noted that he desired the communications that *resulted in the list of nominees,* not just the communications that yielded questionnaires from the already-chosen nominees.

Noting the discrepancy, the civilian defense counsel raised the issue with the military judge, arguing that he still had not received all emails sent back and forth to solicit members. The military judge would not address the issue

---

[51] *Id.* at 218-19.

[52] *Id.* at 220.

[53] *Id.*

[54] *Id.* at 358-59. This was AE XXXII, which primarily consists of emails between the G-1 staff and subordinate units seeking questionnaires from the members whose names had already been forwarded to the G-1 staff as potential members. Specifically, the staff compared the list of nominees to questionnaires received and emailed to solicit the remaining questionnaires.

and directed the civilian defense counsel to work with the trial counsel first. Then court adjourned for the evening on 19 September 2017.

The civilian defense counsel filed a second motion to compel discovery that same evening.[55] In this motion, civilian defense counsel sought "all communications from and within [First] Marine Division pertaining to the solicitation, nomination, and selection of members in this case."[56] Counsel also moved to "[a]bate the proceedings until the evidence requested is produced—especially since the defense has been requesting it since September 13-14, 2017."[57]

On the morning of 21 September 2017, civilian defense counsel raised his written motion with the military judge. The trial counsel stated the emails the Government provided midday on 19 September 2017 consisted of "e-mails between the SJA, the G1, G1 [to] the 1st Marine Regiment, 1st Marine Regiment back to the G1, and G1 back to the SJA."[58] The civilian defense counsel reiterated that he sought *all* emails sent back and forth "up and down the chain regarding solicitation of nominees" for Appellant's court-martial.[59] He summarized his request, "In short, we're requesting all communications pertaining to the members' names and how the members' names and questionnaires were obtained."[60]

The military judge deferred additional discussion until the members were dismissed for the day. When he addressed the issue later that evening, the assistant trial counsel argued the Defense had not shown relevance and necessity, at which point the military judge reminded the Government that he had already ordered it to produce the emails. The assistant trial counsel stated the Government believed the military judge's order was limited to "all e-mails from the SJA to the G-1, all e-mails from the G-1 down to subordinate commands to the adjutant level, and then traffic going back up."[61] The assistant trial counsel twice argued that the Government had fully complied

---

[55] AE XXXVII. This filing attached many of the emails the Defense had received to that point, but which indicated that further emails likely existed.

[56] *Id.* at 4.

[57] *Id.*

[58] Record at 543.

[59] *Id.* at 544.

[60] *Id.* at 544-45.

[61] *Id.* at 688.

with its discovery obligations and answered "yes" when the military judge asked whether the Government had produced "[a]ll e-mails related to the production of those panels, of those convening order modifications."[62]

However, based on a prior conversation with the regional trial counsel, the civilian defense counsel contested the accuracy of the assistant trial counsel's representation. The military judge then reiterated his earlier ruling of 19 September 2017, stating:

> Let me be perfectly clear in my ruling. All electronic mail transmissions, all communications between elements of the division that gave rise to the formation of the court-martial convening order modifications relevant to this case are to be produced.[63]

The military judge did not explicitly rule on the Defense motion to abate the proceedings. However, by this time the trial on the merits had been underway for three days, and he clearly indicated that he intended to proceed with trial while the Government fulfilled its discovery obligations, stating, "I'm not inclined to use time while we're actively . . . litigating this case for this purpose since it's not relevant to the trial on the merits, but an appellate issue."[64] After the military judge clarified his 19 September 2017 ruling on 21 September 2017, the Government produced no additional discovery until after the members returned several findings of guilt.

After findings were announced on the evening of 26 September 2017, the military judge inquired into the Government's progress in fulfilling its discovery obligations pursuant to the judge's discovery order. The assistant trial counsel stated that he received an additional "batch" of emails which would be provided to defense counsel "in the morning," ostensibly referring to 27 September 2017.[65]

On 27 September 2017, the parties presented their sentencing cases, and the members announced their sentence. At some point that day, the Government provided what it at least tacitly represented to be a complete discovery

---

[62] *Id.*

[63] *Id.* at 689.

[64] *Id.* at 688.

[65] *Id.* at 960.

response fulfilling the military judge's order of 19 September 2017.[66] Following announcement of sentence and departure of the members, the civilian defense counsel stated, "[W]e had the opportunity to review, at least part of the e-mail traffic that's been provided to us, and we think there's substantial issues. We anticipate filing a post-trial motion on it, sir."[67]

### 2. Discovery provided after trial

The Defense filed a motion for a post-trial Article 39(a) hearing and a mistrial, arguing that the CA violated Article 25 and exerted unlawful command influence in assembling a stacked members panel.

Even this hearing—brought on by the Government's error—was fraught with delay and more Government-caused error. The post-trial Article 39(a) session was originally convened on 27 November 2017. In preparation for this hearing, the civilian defense counsel had requested production of several officers, including the commanding general, SJA, and Colonel U. He emailed the trial counsel to ascertain the Government's intentions. The trial counsel replied, "The government does intend to produce those witnesses."[68]

However, contrary to her response, on the day of the hearing, the trial counsel indicated her response was an error, and that she intended to state that the Government would *not* produce the witnesses. As a result, the military judge postponed the hearing until 20 December 2017, permitting the Defense to file a motion to compel production of witnesses for the hearing.

Even with this delay, when the court reconvened on 20 December 2017, the trial counsel provided a trove of responsive discovery less than an hour before the hearing began—AE CXV. The emails in AE CXV were subject to the military judge's discovery order. This batch of emails came from Colonel U, the panel president, and, according to Colonel U, had been provided to the Government sometime in December 2017—after the previously scheduled post-trial Article 39(a)—and roughly two to three weeks before the 20 December 2017 hearing date.

The emails in AE CXV revealed the extent of Colonel U's involvement in soliciting potential members from Headquarters Battalion including two members who served on the panel. Additionally, the emails in AE CXV

---

[66] Defense counsel appended this batch of discovery on a DVD to their post-trial motion for a mistrial. These are also appended to the Record as AE CVIII.

[67] Record at 1046.

[68] AE CXII at 4.

revealed, for the first time, that the Division Chief of Staff specifically chose Colonel U as a member because he was a colonel, and that the Chief of Staff told Colonel U as much.

### 3. Why it was a discovery violation

The Government provided discovery to the Defense on approximately four separate occasions, which we will refer to as: Group (1), in response to the Defense motion to compel discovery, on 17 or 18 September 2017—prior to voir dire, the Government provided the alpha roster, SJA's memoranda, and the routing sheet that accompanied the draft convening order; Group (2) on 19 September 2017—during trial on the merits, the Government provided a disk containing emails between the SJA's office and the G-1; Group (3) on 27 September 2017—during pre-sentencing proceedings, the Government provided a disk containing what it tacitly represented to be all emails responsive to the military judge's order; and Group (4) on 20 December 2017—long after trial adjourned, the Government provided additional emails from Colonel U.

All of the items produced were covered by the military judge's 19 September 2017 order. The Government now argues that the trial counsel complied with the military judge's order, noting that that the military judge is permitted to regulate the time, place, and manner of disputed discovery under R.C.M. 701(g)(1). The Government argues the military judge's order permitted the trial counsel to provide discovery after findings and after trial. We disagree.

From the inception of the military judge's involvement in this issue, the military judge urged the Government to act with diligence. Instead of doing so, the Deputy SJA only endeavored to disclose the responsive emails at the end of trial. In his email requesting the information from the pertinent offices, he wrote, "We have until the end of the court-martial to comply which I believe will be over on Tuesday. I apologize for the short fuse and appreciate everyone's assistance."[69] However, the military judge never stated that the Government had until the end of the trial to comply with his discovery order.

In light of the matters sought—which pertained to how individual members were nominated to Appellant's panel—the discovery had utility to the Defense only if it could be used to conduct voir dire of the members. Even

---

[69] AE CVIII, which contains an email sent from Deputy SJA, Major N, to various leaders within the Division, dated 21 September 2017, 5:46 p.m., Subject: Court Ordered Discovery.

after the members were impaneled, for good cause, the Defense could have requested to conduct additional voir dire or to challenge a member based on newly-discovered information. Though not ~~be~~ ideal, such a course of action would have been preferable to committing error that, once findings were reached, could only be resolved by a mistrial.

Discovery Groups (1) and (2) contained no specific details about the methods used at the battalion level to solicit members for Appellant's court-martial. Discovery Group (3) contained an oblique reference that Colonel U assisted in soliciting members from Headquarters Battalion. The email did not name Colonel U but was sent by a senior enlisted leader within the Battalion, writing "CO tasked the Officers."[70] But this email was not disclosed until after findings. The details of Colonel U's specific efforts in soliciting potential members were not disclosed until the trial counsel provided Group (4) on 20 December 2017. We need not speculate whether the Government's actions were deliberate or whether they simply could not be made to care about matters they apparently believed to be ancillary to the case at hand. At a minimum, the Government continually failed to comply with the military judge's clear order and repeatedly violated its discovery obligations.

We next analyze whether these persistent violations entitle Appellant to relief.

## II. DISCUSSION

### A. Did Appellant Waive the Right to Relief from a Discovery Violation?

The Government concedes Appellant did not waive his right to *receive* discovery. In spite of this concession, the Government argues Appellant waived his right to *relief* from this discovery violation.

The Government argues that the civilian defense counsel waived Appellant's right to relief for the discovery violation by: (1) acquiescing to the military judge's remedy; (2) "not re-raising the issue requesting a continuance

---

[70] Email from Sergeant Major C to Master Sergeant O, of 14 August 2017, Subject: Re: SOLICITATION FOR GENERAL COURT MARTIAL MEMBERS, contained within AE CVIII in folder (4).

prior to . . . voir dire"; and (3) failing to request "specific relief for the late disclosure post trial."[71] We find all three arguments are without merit.

*1. Appellant did not waive right to discovery or remedy for discovery violation during trial*

Waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). To establish waiver, it is "more than sufficient to show that defense counsel made a purposeful decision to agree with the military judge's ruling." *United States v. Avery*, 52 M.J. 496, 498 (C.A.A.F. 2000) (citation omitted). We do not find that the Defense made a "purposeful decision to agree" with the military judge's remedy in any way that constituted waiver of Appellant's discovery rights. *Id.*

First, Appellant's defense counsel repeatedly demanded discovery and enforcement of the military judge's order. The military judge granted the Defense's first motion to compel discovery and ordered the Government to provide discovery in a diligent manner. Two days later, the Defense re-litigated the same motion, and the military judge reiterated his earlier ruling to make it "perfectly clear."[72] The judge's remedy ordering the Government to provide the discovery was in Appellant's favor, and had the Government fulfilled its obligations in a timely manner as ordered, the judge's remedy would have satisfied Appellant's rights, enabling him to request to conduct additional voir dire of Colonel U before findings were announced.

Second, the civilian defense counsel preserved Appellant's motion to abate the proceedings. Though he did not explicitly rule on the written request to abate, the military judge implicitly denied the motion by clearly stating that he intended to allow the trial to proceed while the Government continued to provide discovery. He restated this intention when defense counsel re-raised the issue mid-trial, when he stated he believed the matter was solely an "appellate issue." Although the Government faults the Defense for failing to specifically request a continuance prior to conducting voir dire, the military judge expressed his intention to begin trial without further delay. We are confident the military judge would have abated the proceeding had the Government informed him it would not comply with its discovery obligations until more than two months after the adjournment of the court-martial.

---

[71] Appellee's Answer of 8 May 2019 at 66, 69.

[72] Record at 689.

*2. Appellant did not waive his right to relief from the discovery violation based on how he titled his mistrial motion*

a. Defense motion for mistrial

Next, the Government argues that because the civilian defense counsel styled his post-trial motion as an Article 25 and unlawful command influence motion, he waived any substantive relief from the Government's multiple discovery violations. We find this parses the issue too finely and prioritizes labels over substance.

The Defense mistrial motion alleged that the "panel was improperly selected, and unlawful command influence was committed."[73] Citing an email that vaguely referred to Colonel U's role in forwarding potential members[74] to the SJA, the Defense argued that "[h]ad the defense known that the senior member personally nominated two of the members" or that he "approved" the officers nominated to him and forwarded their names, the Defense would have challenged him for cause.[75]

Once the Defense received the emails in AE CXV, the breadth of the Government's discovery violations and Colonel U's role in selecting and forwarding member nominees was made clear for the first time, within an hour before the post-trial hearing commenced. As a result, the civilian defense counsel argued this point even more forcefully during oral argument than he could in his written motion. Also, in AE CXV, the Defense first learned that Colonel U was told he was selected because of his grade.

During the post-trial Article 39(a) hearing, civilian defense counsel questioned Colonel U about the process he used to nominate members. Colonel U testified that he did not have a particular agenda in mind when he solicited members to meet the AMHS tasker. He did not seek members based on qualifications, merely based on the designated grade and availability for the court-martial dates.

---

[73] AE CXX.

[74] The only reference provided prior to the government disclosing AE CXV read, "CO tasked the officers" but that did not explicitly reference Colonel U. Email from Sergeant Major C to Master Sergeant O, of 14 August 2017, Subject: Re: SOLICITATION FOR GENERAL COURT MARTIAL MEMBERS, contained within AE CVIII in folder (4).

[75] AE CX at 9.

After presentation of evidence and argument, the civilian defense counsel reiterated that he would have challenged Colonel U for cause, and he continued to challenge the entire panel—including Colonel U's selection—as being improperly constituted based on grade. The civilian defense counsel specifically requested the military judge make findings of fact and conclusions of law indicating whether he would have granted an implied bias challenge for cause of Colonel U had the Defense made such a challenge.

In AE CXX, the military judge issued findings of fact and conclusions of law. In one such finding of fact, he wrote, "No facts were obtained during Colonel U[ ]'s testimony that would have provided a Defense grounds for challenge that it did not have at the time of trial."[76]

This finding of fact does not dispose of this issue for two reasons. First, this finding of fact does not answer the question of whether the military judge would have granted a challenge for cause had the Defense made one. Second, though styled as a finding of fact, this is a conclusion of law which we review de novo and—for reasons further described below—a conclusion with which we disagree.[77]

b. The legal standard for reviewing specificity to preserve objections

In evaluating whether Appellant preserved his right to relief from this discovery violation, we look to the precedent of our superior court governing the required specificity for objections. The Court of Appeals for the Armed Forces (CAAF) has not required perfect specificity in phrasing evidentiary objections or in articulating objections to the military judge's instructions. MILITARY RULE OF EVIDENCE (M.R.E.) 103, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed), states the requirements for a party to preserve an evidentiary objection for appellate review. In pertinent part, it requires that an accused must "state[ ] the specific ground [for the objection], unless it was apparent from the context."

This same M.R.E. 103 standard extends to an appellant's objection to instructions. *United States v. Payne,* 73 M.J. 19, 23, (C.A.A.F. 2014). "[T]he law 'does not require the moving party to present every argument in support of an objection, but does require argument sufficient to make the military judge aware of the specific ground for objection, "if the specific ground was

---

[76] AE CXX at 6.

[77] Even if treated as a finding of fact, for the reasons described below, this finding of fact is clearly erroneous.

not apparent from the context.'" *Id.* at 23 (quoting *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005)).

The proper phrasing of objections under M.R.E. 103 is properly reviewed in a "practical rather than a formulaic manner." *United States v. Reynoso*, 66 M.J. 208, 210 (C.A.A.F. 2008). We will evaluate the civilian defense counsel's motion using this same M.R.E. 103 standard.

In applying this standard to this case, as the CAAF has written in the context of evidentiary objections, "[t]his is not a case where counsel has shouted 'hearsay,' and only later has come to a conclusion as to the basis for that objection." *Datz,* 61 M.J. at 42. Here, the Defense did more than shout "mistrial." He: (1) specifically articulated that the Government withheld discovery that was ordered to be produced; (2) would have challenged Colonel U for cause or peremptorily based on that discovery, which revealed Colonel U played a significant role in nominating other members; (3) then requested the military judge effectively "rule" on that theoretical challenge for cause in his written findings; and (4) requested the exact remedy he now seeks. Even though his written filing was styled as a frontal challenge to the panel on Article 25 grounds, the civilian defense counsel adequately articulated at least one basis for a challenge for cause that was specific to Colonel U.

Having preserved that objection, this eCourt finds additional grounds to grant the challenge when we review the issue de novo.

### c. The Government's contrary argument

The Government cites several cases that stand for the uncontroversial proposition that the Defense may not assert one basis for relief at trial then assert a completely different basis for relief on appeal. For instance, in *United States v. Lloyd,* 69 M.J. 95 (C.A.A.F. 2010), the court held that the military judge did not abuse her discretion by denying the Defense motion to compel the Government to approve a blood spatter expert. At trial, the Defense argued the expert was needed for one purpose, but on appeal, Lloyd's counsel presented "several new and more detailed arguments" in support of necessity. *Id.* at 100. The court wrote, "We find that the military judge did not abuse her discretion by failing to adopt a theory that was not presented in the motion at the trial level." *Id.* Here, we are not reviewing the military judge's specific ruling for an abuse of discretion because the military judge declined the Defense's invitation to state whether he would have granted a

challenge for cause against Colonel U.[78] The holding in *Lloyd* is not germane to this issue, in which the Defense asked for the only possible relief available after findings to remedy a discovery violation that would have given rise to a challenge for cause before findings. We decline to hold that Appellant waived his rights to relief on the basis presently asserted. He was simply not "intentional[ly] relinquish[ing] . . . a known right" while simultaneously forcefully and repeatedly arguing for the only relief possible. *Gladue,* 67 M.J. at 313.

## B. Did Discovery Failure Materially Prejudice the Appellant?

### 1. Standard of review

The parties do not agree on the proper standard of review.

The Appellant cites *United States v. Roberts,* 59 M.J. 323 (C.A.A.F. 2004), urging us to conduct a de novo review of the trial counsel's fulfillment of her discovery obligations and to apply a harmless beyond a reasonable doubt standard of review for prejudice.

The Government cites *United States v. Shorts,* 76 M.J. 523 (Army Ct. Crim. App. 2017), arguing that we are not permitted to review the errors committed by trial counsel and that we are restrained to solely review whether the military judge abused his discretion. According to the Government, because the Defense raised its motion to compel to the military judge, we are constrained to review only the military judge's actions—not the failures of trial counsel.

We find the Government's interpretation would turn the discovery process on its head and incentivize bad government behavior. Since the Defense had already raised the motion and convinced the military judge to order discovery, it was even more egregious that the trial counsel failed to provide responsive, specifically-requested, court-ordered discovery. The Government not only violated its discovery obligations, but also simultaneously violated a direct court order. To constrain ourselves to solely review the military judge's actions—ordering discovery but refusing to abate the proceedings—would

---

[78] During the post-trial Article 39(a) session, civilian defense counsel argued, "And, given the liberal grant mandate, we're asking the Court to consider – and if the Court would include, in its opinion and findings of fact and conclusions of law in this case, that—I'm asserting to the Court, I would have challenged him for cause, based upon both actual and implied bias and whether the Court would have granted that motion." Record at 1090.

result in holding Appellant to a higher burden than he would face had he never brought the matter to the trial court's attention. This would reward the Government's repeated incorrect representations and culpably dilatory behavior by effectively shielding them from review. This is a perverse result the law does not intend. We decline to apply *Shorts*.

Contrary to the Government's argument, courts regularly review the conduct of trial counsel, who act on behalf of the United States, including reviewing allegations of discovery violations relating to matters of which trial counsel was aware or even unaware. *See United States v. Hart,* 29 M.J. 407 (C.M.A. 1990) (reviewing discovery violation but denying relief because the withheld discovery was not material to the outcome); *United States v. Mahoney,* 58 M.J. 346 (C.A.A.F. 2003) (granting relief for *Brady v. Maryland,* 373 U.S. 83 (1963), violation for failure to disclose exculpatory information of which trial counsel had no actual knowledge). That the civilian defense counsel in this case filed a motion with the military judge does not insulate the Government's discovery failures from appellate review.

We find further support in *United States v. Roberts* for the proposition that we are not constrained to review only the military judge's actions, leaving trial counsel's discovery failure subject to no appellate review. 59 M.J. 323 (C.A.A.F. 2004). In *Roberts,* the CAAF set out a three-tiered analysis for determining the remedy for discovery violations. The court reviewed a military judge's denial of discovery after the military judge conducted an in-camera review and found that disclosure was not required. The court noted that it has delineated two different appellate tests "for determining materiality with respect to the erroneous nondisclosure of discoverable evidence." *Roberts,* 59 M.J. at 326 (quoting *Hart*, 29 M.J. at 410). The second such test is pertinent to cases in which an appellant made a specific request for discovery or in cases of prosecutorial misconduct, and "reflects the broad nature of discovery rights granted the military accused under Article 46." *Id.* at 327. Under this second test, when an appellant "demonstrates that the Government failed to disclose discoverable evidence in response to a specific request . . . , the appellant will be entitled to relief unless the Government can show that nondisclosure was harmless beyond a reasonable doubt." *Id.* (quoting *Hart,* 29 M.J. at 410)). In a footnote, the court wrote:

> [T]he appellate standard of review for assessing the impact of improper nondisclosure is not deferential because we are not reviewing any trial level decision. Our appellate assessment of impact is no different regardless of whether the discovery issue was ruled on by the military judge under R.C.M. 701(g)(2) or whether it arose from a Government decision to withhold certain evidence that was not discovered until after trial.

*Roberts*, 59 M.J. at 327 n.3.

Here, we are faced with a "Government decision" that resulted in with-holding "certain evidence that was not discovered until after trial." *Id.* Whether the decision was deliberate, due to ineptitude, or due to the fact that the Government could not ask the president of the panel to provide responsive discovery *while he was serving as the president of the panel*, we need not decide. Therefore, we will apply a non-deferential standard of review to determine whether the non-disclosure was harmless beyond a reasonable doubt.

*2. Assessing harm of discovery violation relating to members selection materials*

a. The *Modesto* standard

When the improperly withheld discovery pertains to a member, we must determine whether the material would have given rise to a ground for challenge of the member for cause or whether the improper nondisclosure precluded "effective" voir dire. *United States v. Modesto,* 43 M.J. 315, 316 (C.A.A.F. 1995).

"Voir dire is a critical tool for ensuring that the accused is tried by an impartial trier of fact—the 'touchstone of a fair trial.'" *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)).

We find little case law describing what constitutes "effective" voir dire as discussed in *Modesto*. In *United States v. Glenn,* 25 M.J. 278 (C.M.A. 1987), the court reversed the sentence the members adjudged after the appellant's guilty plea because the SJA failed to disclose that one of the members was his sister-in-law. The failure to disclose this information "precluded effective voir dire and made it impossible for either the military judge or counsel to accurately test [the member] for bias or determine whether a challenge for cause was necessary." *Id.* at 280. This was despite the parties' opportunity for "extensive" voir dire. *Id.* at 279.

Voir dire is often *informed* by the information available about the member—typically through his or her member's questionnaire and the answers given during group voir dire. Here, the Government argues the Defense could have asked generally whether any member nominated any other member of this panel.

The Defense, without discovery suggesting it was prudent to ask these questions, did not. We do not expect—nor would military trial judges countenance—defense counsel to maintain a litany of questions that presuppose that irregularities took place in the members selection process. Just like

the counsel in *Glenn* were not faulted for failing to ask whether any member was related to the SJA, we do not fault the Defense team for conducting voir dire as they did.

Appellant's counsel was given a post-trial opportunity to question Colonel U in support of his mistrial motion. However, by this point, the Defense was in a very different position than it would have been prior to challenges and excusals, as we further describe below. "Trial judges are not mere robots[.]" *United States v. Warren*, 13 M.J. 278, 287 (C.M.A. 1982) (Fletcher, J., concurring). Though they are presumed to appreciate the effect their decisions have on matters before them, the wide gulf between deciding a challenge for cause for implied bias during voir dire and declaring a mistrial more than two months after adjournment is clear and obvious.

However, we can only reverse Appellant's conviction if the undisclosed information would have given rise to a challenge for cause—not a peremptory challenge. *Modesto,* 43 M.J. at 320 (citing *Williams v. United States* 418 F.2d 372, 377 (10th Cir. 1969)).

### b. Standard for granting an implied bias challenge for cause

A member should be excused "whenever it appears that the member . . . [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). A challenge for cause may be based on actual or implied bias. Actual bias is not at issue here.

"[I]mplied bias is reviewed under an objective standard, viewed through the eyes of the public." *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001) (citation omitted). When analyzing implied bias, the "focus is on the perception or appearance of fairness in the military justice system." *Id.* (citation omitted). We must assess whether "we are placing an intolerable strain on public perception of the military justice system." *Id.* at 175.

We must determine whether there is "'too high a risk that the public will perceive' that the [appellant] received less than a court composed of fair, impartial, equal members." *United States v. Moreno,* 63 M.J. 129, 134 (C.A.A.F. 2006) (quoting *Wiesen,* 56 M.J. at 176).

The implied bias challenge "stems from the 'historic concerns about the real and perceived potential for command influence' in courts-martial." *United States v. Peters,* 74 M.J. 31, 34 (C.A.A.F. 2015) (citing *United States v. Clay,* 64 M.J. 274, 277 (C.A.A.F. 2007)). The test does not focus on the "subjective qualities of the panel member, but on the effect that panel member's presence will have on the public's perception of whether the appellant's trial was fair." *Id.* (citing *United States v. Rome,* 47 M.J. 467, 469 (C.A.A.F. 1998)).

Military judges must "grant challenges for cause liberally," including implied bias challenges. *Modesto,* 43 M.J. at 318 (citation omitted). "The liberal grant rule protects the 'perception or appearance of fairness of the military justice system.'" *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005) (citation omitted). The liberal grant mandate "also serves as a preventative measure because 'it is at the preliminary stage of the proceedings that questions involving member selection are *relatively easy* to rapidly address and remedy.'" *Peters,* 74 M.J. at 34 (emphasis added) (quoting *Clay,* 64 M.J. at 277).

Because challenges for implied bias are based on an objective standard and do not rely on credibility determinations, we "give less deference to the military judge" when reviewing rulings on challenges based on implied bias. *United States v. Minyard,* 46 M.J. 229, 231 (C.A.A.F. 1997). The standard is "less deferential than abuse of discretion, but more deferential than de novo." *United States v. Woods,* 74 M.J. 238, 243 (C.A.A.F. 2015) (citing *United States v. Downing,* 56 M.J. 419, 422 (C.A.A.F. 2002)).

*3. Would Colonel U be subject to challenge?*

In determining whether an implied bias challenge would have been granted, we are guided by cases in which appellate courts have reviewed denials of members' challenges. Although they help illustrate the standard for granting an implied bias challenge, we find those cases to be distinguishable.

In assessing prejudice to Appellant, we are reviewing a case in a different procedural posture from the vast majority of cases pertaining to members' challenges. Most implied bias challenge cases arise after: (1) the defense conducted effective voir dire; (2) the parties argued the defense challenge for cause; and (3) the military judge considered the liberal grant mandate, articulated the reasoning for denial, and denied the challenge. In that procedural posture, a court has a trial level ruling to review, with full knowledge that the trial judge considered the liberal grant mandate. An appellate court then conducts a review that is slightly more deferential than de novo.

Here, we must consider what *should have happened* had the Government provided discovery and voir dire proceeded as expected. We have some insight into Colonel U's likely responses to questions. But we have no trial level

ruling to review.[79] In some ways, this is similar to reviewing a suppression motion that never happened due to ineffective assistance of counsel. It would deprive an accused of his Sixth Amendment right to effective counsel if an appellant were required to show the suppression motion would have been meritorious rather than just a "reasonable probability" it would have been meritorious. *United States v. Jameson*, 65 M.J. 160, 163-64 (C.A.A.F. 2007) (citation omitted). In the same vein, it would deprive an accused of his right to effective voir dire if appellate review of a challenge for cause that never happened due to the Government neglecting its court-ordered discovery obligations required anything other than a de novo review.

Due to the circumstances under which this issue arose, we have no option but to conduct a de novo review of whether an implied bias challenge would have been granted. We must apply the liberal grant mandate as the military judge would have done had the challenge been made during trial. To do otherwise would be to incentivize the government's collective behavior in withholding discovery. Any SJA or trial counsel could merely withhold discovery until after findings—when the court has no recourse other than to grant a mistrial—when the government knows the standard for granting a mistrial is substantially higher than the standard for granting a challenge for cause, even considering the liberal grant mandate.

We believe such a challenge would have been granted. Considering the liberal grant mandate, we do not believe a member of the public would perceive that Appellant received a fair trial with Colonel U on his panel. We reach this conclusion for two reasons: (1) Colonel U was informed he was chosen for the panel by the Chief of Staff *because of his grade*; and (2) Colonel U exercised some discretion in deciding which potential members would be forwarded for consideration, and he played a more than ministerial role in soliciting members.

Assessing the first reason, a reasonable member of the public would be concerned that Colonel U was hand-selected because of his grade. This concern is magnified by the fact that the CA improperly selected the panel in GCMCO 1a-17 based on grade, purposefully excluding junior members. Pursuant to *Bartee,* we are required to view GCMCO 1b-17 as cured of the defects that afflicted GCMCO 1a-17. But we are faced with the reality that

---

[79] As noted above, in AE CXX, the military judge wrote, "No facts were obtained during Colonel U[ ]'s testimony that would have provided a Defense grounds for challenge that it did not have at time of trial." However, he never addressed the merits of such a challenge. AE CXX at 6.

the now-validated panel remained *exactly* the same as the panel that was determined to be invalid less than 24 hours earlier. Although the military judge was constrained by binding precedent to accept the CA's *Bartee* letter, the letter's curative powers did nothing to eradicate our concerns that are specific to Colonel U as a member—including his knowledge of *why* he was selected and the fact that he assisted in assembling the members panel.

Whether Colonel U was selected as a member *because* of his grade is a different issue from the fact that he was *told* that was the reason he was selected. The *Bartee* letter could cure the first defect but not the latter.

Our concerns are exacerbated by the fact that Colonel U was the panel president. In *United States v. Woods,* in weighing whether a military judge should have granted a challenge for cause, the CAAF took note of the fact that the challenged member was the *senior* member. 74 M.J. 238, 245 (C.A.A.F. 2015).

In that role, Colonel U would determine in which order the panel would vote on specifications, subject to being overruled by a sufficient number of his fellow members, check the junior member's vote count, fill out worksheets, and speak for the panel.[80] We are aware that the members are presumed follow the military judge's instructions not to consider rank or grade during deliberations. However, this instruction cannot cure the fact that Colonel U was told he was selected for the panel because of his grade. Colonel U was effectively told, "You're my colonel in the room." This message has far-reaching implications, given Colonel U's seniority, the manner in which he himself was selected, and his subsequent assistance in selecting other members.

A member could receive this message in a way that could be interpreted as either pro-Government or pro-Defense, depending on the facts of the case. In this case, in the context of the commanding general's stated intention to exclude junior ranking members, this message can reasonably be perceived as conveying that the commanding general intended Colonel U to take charge of the junior members. No part of Colonel U's voir dire specifically addressed this message because the Government denied the Defense the ability to conduct effective voir dire by withholding discovery.

Not only was Colonel U told he was selected because of his grade, but he was also aware that it was so important to the Chief of Staff that *a colonel* serve on the panel that he was told to prioritize the court-martial over the

---

[80] *See* Record at 930-32.

change of command of one of his subordinate company commanders. As such, he was not only told that he was selected as a member *because* of his grade, he was also implicitly informed that it was of the utmost importance that *a colonel* serve.

Our first concern is only amplified by the second: the fact that Colonel U was personally involved in forwarding potential members to the SJA's office. The SJA's office outsourced much of its role in assembling a members panel to the G-1, and ultimately to the subordinate commanders. While this is not per se improper, in this case the process resulted in the panel president having: (1) twice sought advice from the SJA about who could or should be nominated to the panel; (2) exercised discretion over which units would provide members of the desired grades; and (3) decided which major to forward for consideration when two were nominated.

Assessing this basis, we note that the military judge granted an implied bias challenge for cause and excused another member—Major D—in part because Major D "*may* have nominated another member."[81] That other member was Gunnery Sergeant S, who wrote on his member's questionnaire that he was "just filling out this paper per my [commanding officer]."[82] When civilian defense counsel asked about this response during voir dire, Gunnery Sergeant S stated that either his commanding officer—Major D—or the battalion adjutant sent the member's questionnaire to him and directed him to fill it out. Then he stated he believed, but was not certain, that he sent the completed questionnaire to Major D to be forwarded up the chain of command. The Defense challenged Major D on these and other grounds, and the military judge granted the challenge, in part, because it was *possible* that Major D may have nominated Gunnery Sergeant S and received and forwarded his member's questionnaire. Given the military judge's reaction to this challenge—based on a mere *possibility* that Major D may have nominated Gunnery Sergeant S—we are confident that the military judge would have granted an implied bias challenge against Colonel U.

When assessing how the military judge would have handled the challenge to Colonel U, had one been made, we also look to superior court precedent reviewing denials of defense challenges for cause. We find *United States v. Peters,* 74 M.J. 31 (C.A.A.F. 2014), to be most analogous to this case. In *Peters,* a member was a commander who received military justice advice from

---

[81] *Id.* at 355 (emphasis added).

[82] AE XXVII at 38. This was in response to the question, "Do you have any knowledge of any of the facts of the pending court-martial . . . ?" *Id.*

the trial counsel. *Id.* at 33. He also consulted the trial counsel in advance of trial to ask whether it was common practice for commanders to sit as members on brigade cases. *Id.* Although the member was not actually biased, the CAAF held that their solely professional "relationship went beyond what would be perceived as fair to an appellant in the context of a typical court-martial." *Id.* at 36.

We also find *United States v. Wiesen,* 56 M.J. 172 (C.A.A.F. 2001), to be instructive. In *Wiesen,* the court held that the military judge erred in denying the implied bias challenge for cause of a senior member who was in the rating chain of six other members. Those members were subjected to voir dire on the issue and "all indicated that they could express their opinions' [sic] freely and openly and that they would not be inhibited or unduly influenced by any superior." *Id.* (quoting the record). Yet, even extensive voir dire was insufficient to cure the public perception that Wiesen received something less than a fair trial because the senior member and the six junior members could form a voting bloc sufficient to convict. As a result, the court reversed the conviction.

In this case, the defense counsel were able to question Colonel U and ask him whether he believed the commanding general desired a specific outcome. He answered no. However, we do not find Colonel U's answer to this general question sufficiently cures the negative public perception that would arise from the fact that Colonel U knew he was picked for the panel because of his senior grade and further knew it was more important for *any colonel* to serve on the panel than for him to attend a subordinate company commander's change of command. Like the panel members in *Wiesen,* a negative public perception can remain even though all panel members in *Wiesen* said they could exercise independent discretion even though six members reported to the senior member.

Contrary to the Government's argument, this is not the type of conflict that would be readily apparent from reading Colonel U's court member questionnaire, such that the defense counsel was required to "make reasonable inquiries into the background of the member" to avoid waiving the issue. *See United States v. Dunbar*, 48 M.J. 288, 290 (C.A.A.F. 1998).

Even though the military judge in this case was required to hold that the *Bartee* letter cured these defects in relation to the validity of the panel composition as a whole, the *Bartee* letter did nothing to cure the public's perception of the propriety of Colonel U's role on the panel in light of his actions and knowledge.

Reviewing "the totality of the circumstances," and assuming, as we must, "the public to be familiar with the unique structure of the military justice system," we conclude that "there is 'too high a risk' that the public would

question the fairness of Appellant's trial." *Woods*, 74 M.J. at 245 (quoting *Wiesen*, 56 M.J. at 176).

In light of the liberal grant mandate, "if after weighing the arguments for the implied bias challenge the military judge finds it a close question, the challenge should be granted." *Peters*, 74 M.J. at 34. In this case, a challenge to Colonel U is unquestionably a close question. A court faced with such a challenge from the defense must "err on the side of granting a challenge." *Id*. Combining Colonel U's role with the message conveyed to Colonel U about why he was selected, we find that, conducting a de novo review and applying the liberal grant mandate, a challenge for cause based on implied bias would have been granted. Accordingly, we find that Appellant was prejudiced by the Government's discovery violation.

## C. What Relief is Warranted

We recall the CAAF's description of the liberal grant mandate as a "preventative measure because 'it is at the preliminary stage of the proceedings that questions involving member selection are relatively easy to rapidly address and remedy.'" *Peters,* 74 M.J. at 34. (quoting *Clay,* 64 M.J. at 277). But this preventative measure can be employed only if the Defense has not been denied their ability to conduct effective voir dire through dilatory acts of the Government. At the present juncture in this case, after guilty findings were returned relating to multiple victims, and a 39-year sentence issued, we can no longer "rapidly address and remedy" a problem created long ago.

The seeds of this problem were sown in June 2017, when Colonel U was told he was selected because of his grade; made worse in August 2017 when Colonel U assisted in forming the panel; and came fully to fruition in September 2017 when Colonel U was impaneled as president and the Government over the course of a two-week period—and for months to follow—failed to provide requested and court-ordered discovery that shed crucial light on Colonel U's selection and his role in selecting other panel members. The military judge did not help matters when he denied the Defense motion to abate the proceedings and failed to exercise close supervision over the trial counsel's compliance with his order, given the fact that the trial counsel had demonstrated, time and again, that they were ill-informed, purportedly confused by his clear order, and not motivated to comply. Given this course of events, the only available remedy is to reverse the findings and the sentence. These repeated missteps leave us no intermediate recourse.

## III. CONCLUSION

The findings and sentence as approved by the convening authority are **REVERSED**. A rehearing is authorized.

Judges LAWRENCE and J. STEPHENS concur.

J. STEPHENS, Judge (concurring, *dubitante*):

I concur with the opinion of the Court in full.

In March 2017, Chief Judge Erdmann made a prediction about member selection. His dissent in *United States v. Bartee* warned:

> The future implications of the majority's holding are troubling. It is not difficult to envision that when a panel is held to be solicited in violation of Article 25, a convening authority need only be provided with an alpha list of his command, state that he knew he could select anyone in his command, and then reinstate the improperly convened panel with impunity. This would allow convening authorities to end-run decades of this court's precedent on the prohibition of excluding potential panel members on the basis of rank, and select only the most senior of panels, under the protection of our newest ruling. This cavalier attitude toward the requirements of Article 25, on the part of the command and apparently disseminated to trial counsel should not be tolerated.[1]

In less than six months, his prediction came true.

The Convening Authority in this case clearly set out to stack his panel with senior officers, even ensuring that "a colonel"[2] was the head of what looks less like a members panel than a special purpose MAGTF.[3] If commanders and their staff judge advocates are going to ignore Article 25 and relevant case law in selecting members, then it is up to the trial and appellate judiciary to insist the law be followed. However, due to *Bartee*, we must be complicit in Article 25's defenestration.

For a convening authority to select senior members solely based on grade, he must simply utter the "talismanic incantation"[4] of "*Bartee*" to remove the

---

[1] *United States v. Bartee*, 76 M.J. 141, 150 (C.A.A.F. 2017) (Erdmann, C.J., dissenting) (citation omitted).

[2] Appellate Exhibit CXV at 44. The Chief of Staff's email declares, [Colonel U] it is . . . I do not have any other Colonels in the Div[ision] at that time!"

[3] Marine Air Ground Task Force.

[4] *See, e.g., United States v. Gamble*, 27 M.J. 298, 304 (C.M.A. 1988) (finding broad talismanic incantations of words such as motive, intent et al. not sufficient to admit

*(footnote continued next page)*

taint. Such an incantation was on display here. After the military judge excused the panel, the very next morning[5] the Government resubmitted the exact same members, with the explanation that it "would be relying on . . . *Bartee*."[6] The regional trial counsel sent an email from his BlackBerry to the civilian defense counsel that simply read, "GOV discovery RE mod CO. See US v Bartee CAAF 2016 case."[7] This is a digital microphone drop.

While we are required to believe the *Bartee* maneuver removes the taint from the panel selection, it is doubtful the general public would believe such a thing. It is doubly doubtful an accused would believe it. Here, the convening authority improperly selected 15 members out of his nearly 5,000 eligible Marines and Sailors. We are asked to believe he then sat down, after being frustrated by the military judge, reviewed his alpha roster of those 5,000 potential members, and—in good faith—arrived at the exact same 15 members. I believe requiring evidence of the convening authority's bad faith as a prerequisite to dismissing an improperly selected panel is simply too much temptation for a convening authority. It would be better to adopt a bright-line rule that once a panel is excluded, all the nominated members of that panel are permanently excluded with respect to that accused.

Burdensome as it may be to select new members after a military judge disqualifies them due to panel-stacking, I think it worth keeping in mind that our entire system of justice is intentionally burdensome to the government to preserve the rights of the accused. It would also take less time to properly select a panel on the Article 25 criteria in the first place. Moreover, conscientious convening authorities may still arrive at "senior" panels using the Article 25 criteria, rather than using grade as a proxy.

In this case, the "cavalier" attitude predicted by Chief Judge Erdmann was not confined to Article 25. It permeated the discovery of materials related to the member selection. It is clear the Government was uninterested in making timely production of the member selection documents sought by

---

evidence under Military Rule of Evidence 404(b)); *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015) ("Incantation of the legal test without analysis is rarely sufficient in a close case."); *United States v. Sterling*, 75 M.J. 407, 421 (C.A.A.F. 2016) (Ohlson, J., dissenting) (finding "talismanic invocation of 'good order and discipline'" not enough).

[5] Record at 206.

[6] *Id.*

[7] Appellate Exhibit XXIX.

the Defense and ordered by the military judge. It was also clear the military judge, and even the civilian defense counsel, were less than enthusiastic about the production. And why should any of the parties be diligent in their respective duties? *Bartee* makes it all a labor of Sisyphus.

In my own view, this panel was improperly selected from the start because the members were selected solely based on grade. This was done contrary to Article 25 and contrary to our superior court's holding in *United States v. Kirkland*.[8] Though we are required[9] to allow *Bartee* to carry the day for the Government—at least for the issue of the panel selection process—I would humbly submit that our superior court should revisit *Bartee* before panel stacking becomes the norm against our Marines and Sailors.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[8] 53 M.J. 22 (C.A.A.F. 2000).

[9] *United States v. Davis*, 76 M.J. 224, 228 n.2 (C.A.A.F. 2017).